UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**V.F. GARMENT, INC.,**

                      **Plaintiff,**

           -v-                                **5:05-CV-1137**
                                                  **NAM/DEP**

**SEABOARD ATLANTIC GARMENT, INC.;
SEABOARD GRAPHIC SERVICES, LLC; GERALD
WILSON, a/k/a Gerry Wilson, individually; DENNIS
WILSON, individually; and AMERICAN FASHION
NETWORK, LLC,**

                      **Defendants.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**CENTURY GARMENT, INC.**

                      **Plaintiff,**

           -v-                                **5:05-CV-1431**
                                                  **NAM/DEP**

**SEABOARD ATLANTIC GARMENT, INC.;
SEABOARD GRAPHIC SERVICES, LLC; AMERICAN
FASHION NETWORK, LLC; GERALD WILSON, a/k/a
Gerry Wilson, and  individually; DENIS WILSON,
individually,**

                      **Defendants.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Laurin R. Haddad, Esq.
333 East Onondaga Street, Suite 300
Syracuse, New York 13202
Attorney for V.F. Garment, Inc. and Century Garment, Inc.

Douglas A. Foss, Esq., of counsel
Harris, Beach PLLC
99 Garnsey Road
Pittsford , New York 14534
Attorneys for Seaboard Atlantic Garment, Inc; Gerald Wilson; and Dennis Wilson

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## INTRODUCTION

V.F. Garment, Inc. ("V.F. Garment"), plaintiff in Case No. 5:05-CV-1137, and Century Garment, Inc. ("Century Garment"), plaintiff in Case No. 5:05-CV-1431, are in the business of cutting, sewing, and finishing garments.[1]  From 2000 to May 2005, defendant Seaboard Atlantic Garment, Inc. ("Seaboard Atlantic"), which manufactured and distributed garments, contracted with plaintiffs to provide cutting, sewing, and finishing services.  Defendants Gerald Wilson and Dennis Wilson, son and father respectively, were sole shareholders of Seaboard Atlantic, and both served as officers and on the Board of Directors, along with other family members.  Plaintiffs bring these actions to recover monies due for garment finishing work performed for Seaboard Atlantic between April 1, 2005 and May 19, 2005.

Seaboard Atlantic defaulted in this action.[2]  The remaining defendants, Gerald and Dennis Wilson (together, "Wilsons"), move for summary judgment in both cases (Case No. 5:05-CV-1137, Dkt. No. 38; Case No. 5:05-CV-1431, Dkt. No. 28), primarily on the ground that they are not personally liable for the monies owed to plaintiffs by Seaboard Atlantic.  Plaintiffs cross-move for summary judgment (Case No. 5:05-CV-1137, Dkt. No. 58; Case No. 5:05-CV-1431, Dkt. No. 45).  Plaintiffs argue that they are entitled to pierce the corporate veil and impose liability on the Wilsons for the corporation's debts.  For the reasons set forth below, the Court denies the motions and cross motions.

## THE COMPLAINTS

---

[1] Except where necessary to distinguish one from the other, the Court refers to V.F. Garment and Century Garment together as "plaintiffs."

[2] Seaboard Atlantic defaulted in answering the amended complaints, and the Clerk entered defaults against it in both cases (Case No. 5:05-CV-1137, Dkt. No. 37; Case No. 5:05-CV-1431, Dkt. No. 14).  Plaintiffs voluntarily dismissed the action against the other two defendants, Seaboard Graphic Services, LLC and American Fashion Network, LLC (Case No. 5:05-CV-1137, Dkt. No. 23; Case No. 5:05-CV-1431, Dkt. No. 19).

In its amended complaint (Case No. 5:05-CV-1137, Dkt. No. 16), plaintiff V.F. Garment claims that between April 1, 2005 and May 19, 2005, pursuant to Seaboard Atlantic's orders, it serviced and delivered to Seaboard Atlantic more than 100,000 garments for a total purchase price of $143,511.66.  Seaboard Atlantic accepted all of the finished garments and received invoices for them.  According to the complaint, Seaboard Atlantic ceased making payments as of April 12, 2005, and has made no further payment.  V.F. Garment seeks to recover $143,511.66 plus interest.   The first five causes of action are stated against Seaboard Atlantic.  The first cause of action is for an account stated; the second is for breach of contract; and the third is for implied contract.  In the fourth cause of action, based on promissory estoppel, V.F. Garment alleges that its representative had several conversations with Gerald Wilson regarding the unpaid invoices; that Gerald Wilson gave assurances that Seaboard Atlantic would pay all outstanding invoices and orders and encouraged V.F. Garment to continue to perform services; and that in reliance on Gerald Wilson's representations, V.F. Garment continued to perform services to its detriment.  In the fifth cause of action, for fraud, V.F. Garment adds that when he made the representations, Gerald Wilson knew that they were false and that Seaboard Atlantic was unable to pay.

V.F. Garment's sixth cause of action seeks to pierce the corporate veil and recover from the Wilsons individually, based on the following allegations: that the Wilsons "have full ownership interests in Seaboard Atlantic and have dominion and control of the transactions between Seaboard Atlantic and V.F. Garment"; that Dennis Wilson "is the Chairman or Chief Executive Officer of Seaboard Atlantic"; that the Wilsons "have dominion and control over Seaboard Atlantic's daily operations, management, finances, customer relations and accounts payable"; that the Wilsons "had knowledge, or reckless disregard of Seaboard Atlantic's financial problems, inability to pay the V.F. Garment invoices, dated from April 10, 2005 to May 19, 2005,

and failed to inform V.F. Garment of the risk of not being paid"; that they "knew or should have known that their false assurances, statements, representations and actions would be relied upon by V.F. Garment regarding invoices that were due and owing"; that their "false assurances, statements, representations, and actions were wrongful, unjust and fraudulent and in fact induced V.F. Garment to continue to provide services to Seaboard Atlantic"; and that they "abused their ownership and domination of Seaboard Atlantic and the transactions with V.F. Garment, thus abusing the privilege of doing business in the corporate form to perpetrate a wrong or injustice against V.F. Garment."[3]

The amended complaint in the Century Garment case (Case No. 5:05-CV-1431, Dkt. No. 3) sets forth the same causes of action based on nearly identical factual allegations. Century Garment claims that Seaboard Atlantic and the Wilsons owe it $120,652.79.

## APPLICABLE LAW

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in the nonmovant's favor, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a genuine issue of material fact requiring a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* at 248. If the nonmovant fails to carry this burden,

---

[3] The seventh and eighth causes of action are against Seaboard Graphic Services, LLC and American Fashion Network, LLC, which are no longer parties. *See* footnote 2, *supra*.

summary judgment is appropriate. *See Celotex,* 477 U.S. at 323-24.

In support of their claims against Gerald and Dennis Wilson, plaintiffs contend the Court should pierce the corporate veil and impose on the Wilsons personal liability for Seaboard Atlantic's debts to plaintiffs. New York State courts "are reluctant to disregard the corporate entity[,]" *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989), and a party seeking such relief bears a "heavy burden." *TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339 (1998). Nevertheless, "courts will disregard the corporate form, or, to use the accepted terminology, pierce the corporate veil, whenever necessary to prevent fraud or to achieve equity." *Walkovszky v. Carlton*, 18 N.Y.2d 414, 417 (1966) (internal quotes omitted).

New York's high court states the general principles of the doctrine as follows:

> The concept of piercing the corporate veil is a limitation on the accepted principles that a corporation exists independently of its owners, as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners.
>
> The doctrine of piercing the corporate veil is typically employed by a third party seeking to go behind the corporate existence in order to circumvent the limited liability of the owners and to hold them liable for some underlying corporate obligation. The concept is equitable in nature and assumes that the corporation itself is liable for the obligation sought to be imposed. Thus, an attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners.
>
> Because a decision whether to pierce the corporate veil in a given instance will necessarily depend on the attendant facts and equities, the New York cases may not be reduced to definitive rules governing the varying circumstances when the power may be exercised. Generally, however, piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.
>
> While complete domination of the corporation is the key to piercing the

> corporate veil, especially when the owners use the corporation as a mere device to further their personal rather than the corporate business, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required. The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene.

*Morris v. New York State Dept. of Taxation and Fin.*, 82 N.Y.2d 135, 140-42 (1993) (citations and footnote omitted).

The Second Circuit notes that "the issue of corporate disregard is generally submitted to the jury." *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 59 (2d Cir. 1988). It is the task of the jury to "decide whether – considering the totality of the evidence – the policy behind the presumption of corporate independence and limited shareholder liability – encouragement of business development – is outweighed by the policy justifying disregarding the corporate form – the need to protect those who deal with the corporation." *William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (1991). The Second Circuit has identified a number of factors that "would tend to show that defendant was a dominated corporation," including the following:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Id*. The Second Circuit has also observed that where, as here, the case involves a small privately

held corporation, "the trappings of sophisticated corporate life are rarely present." *William Wrigley*, 890 F.2d at 601.  Factors particularly relevant to the question of individual domination of a small corporation include the failure to observe corporate formalities, undercapitalization of the corporation, the intermingling of corporate and personal funds, insolvency at the time of the transaction, and the siphoning of corporate funds by the owners.  *Id*. at 600-01.

## DISCUSSION

Even taking into account the "heavy burden" on a party seeking to set aside the corporate form, the Court finds sufficient evidence to resist defendants' motions for summary judgment when the evidence is viewed in the light most favorable to plaintiffs, and all reasonable inferences are drawn in their favor.  On the other hand, viewing the evidence in the light most favorable to defendants, and drawing all reasonable inferences in their favor, the Court finds that summary judgment for plaintiffs must be denied.

 The record evidence on these motions is extensive.  It is undisputed that at all relevant times and during the eight preceding years, Gerald and Dennis Wilson owned all Seaboard Atlantic's stock; that the Wilsons and members of their family held almost all director and officer positions; and that the Wilsons managed the finances, directed the employees, and otherwise personally managed the business.  The record shows that Seaboard Atlantic observed corporate formalities such as holding regular board meetings, paying corporate debts from corporate bank accounts, and holding business assets in the corporate name.

There is substantial relevant evidence, some of which is in dispute, concerning Seaboard Atlantic's relationship with its commercial lender, Manufacturers and Traders Trust Co. ("M&T"), which had held a security interest in the corporate assets since 2001.  By November 2004, Seaboard Atlantic owed M&T about $5 million and was losing money.  There is evidence,

primarily from John Emerson, M&T's representative, that as early as November 10, 2004, he discussed with the Wilsons the fact that Seaboard Atlantic "needed additional dollars to be able to stay in business and purchase raw material." In an internal memo regarding the meeting, Emerson cited "significant officer withdrawals" – that is, high officer salaries – as a factor contributing to "the significant collateral shortfall."

The record shows that on December 29, 2004, Seaboard Atlantic borrowed $400,000 from M&T. According to Emerson, this sum was needed as working capital to continue the business "long enough to complete billing out inventory, creating receivables, finishing contracts with JC Penney, Dollar General, etc." and thus to "create receivables and hopefully reduce indebtedness." Emerson characterized the loan as part of a "complete liquidation program designed to maximize the potential recovery of dollars." Gerald and Dennis Wilson personally guaranteed this loan, and a family-owned entity, Wilson Properties LLC ("Wilson Properties"), also gave a guarantee backed by a mortgage in its real estate holdings.[4] Eventually, Wilson Properties' realty was sold to help pay Seaboard Atlantic's debt to M&T.

There is evidence that in March and April 2005 M&T gave Seaboard Atlantic additional loans totaling $1.4 million to complete outstanding orders and create more receivables. In conjunction with these loans, Gerald Wilson's wife Jacqueline Wilson and her father Joseph Blancato each gave personal guarantees for $700,000. All receivables were to be paid to M&T, first to repay the new advances, then to reduce the pre-existing debt. Emerson stated that as of March 23, 2005, Gerald and Dennis Wilson understood that if Seaboard Atlantic generated sufficient receivables, M&T "would release them from their [personal] guarantees provided we

---

[4] The Wilsons owned 98% of Wilson Properties; Melinda Kuhn (Gerald Wilson's sister and Dennis Wilson's daughter) owned the remaining 2%.

had their total cooperation within the process, in terms of them agreeing to give us all the proceeds from all the sales, from both ... all the physical assets, as well as any intangibles, and receivables[.]" Emerson did not know whether Seaboard Atlantic used contractors (such as plaintiffs) in order to create receivables.

There is also evidence that by March 23, 2005, the Wilsons knew that M&T intended to foreclose on its security interest and liquidate Seaboard Atlantic in mid-May; that in early April 2005 Seaboard Atlantic sold some of its equipment; that in early April 2005 Gerald Wilson told Reneé Braley, a Seaboard Atlantic employee, that Seaboard Atlantic would soon be closing but that she should not tell any contractors until they completed production; that in April 2005 Seaboard Atlantic began making only partial payments to plaintiffs for outstanding invoices; that between April 1, 2005 and May 19, 2005, V.F. Garment serviced and delivered, pursuant to Seaboard Atlantic's orders, more than 100,000 finished garments; that between April 1, 2005 and May 17, 2005, Century serviced and delivered, pursuant to Seaboard Atlantic's orders, more than 100,000 finished garments; and that Seaboard Atlantic accepted all the finished garments from both plaintiffs but did not pay for them in full.  There is disputed evidence regarding statements allegedly made by Gerald Wilson to plaintiffs' representatives in April and/or May 2005 regarding when plaintiffs would be paid.

In addition, there is evidence concerning another family-held entity, Seaboard Graphic Services, LLC ("Seaboard Graphic"), owned half by Seaboard Atlantic and half by Larry Kuhn, Dennis Wilson's son-in-law.  On January 1, 2005 Larry Kuhn purchased Seaboard Atlantic's interest in Seaboard Graphic for $300,000.  The Purchase Agreement states that Seaboard Graphic owed Wilson Properties $50,000 "which indebtedness was transferred by [Wilson Properties] to Dennis Wilson" and which Seaboard Graphic agreed to pay directly to Dennis

Wilson. Emerson said he believed the balance of the proceeds received by Seaboard Atlantic from this transaction went to help pay the debt to M&T. The record also shows that on January 27, 2005, Dennis Wilson wrote to himself a $60,000 check from a Seaboard Atlantic checking account and deposited the sum in his personal checking account. Three days later he deposited the sum in another Seaboard Atlantic account and used it to pay corporate debts. Accepting the Wilsons' explanations of these transactions does not eliminate the transactions' relevance on the issue of the degree of separation between the Wilsons' personal business and the family-held businesses.

As may be seen from this brief summary of limited aspects of the record, there are issues bearing on corporate domination that cannot be resolved on summary judgment. Such issues include the extent to which the Wilsons observed the boundaries between corporate and personal assets and obligations; the extent to which the transactions among Seaboard Atlantic, the Wilsons, other family members, and other family businesses were carried out at arms length; whether at the time of the transactions with plaintiffs in April and May 2005, the Wilsons knew the corporation was being liquidated and thus would be unable to pay plaintiffs in full for the garments ordered and accepted; and whether, as plaintiffs claim, at the time of the transactions in issue the Wilsons were continuing the business in the corporate form solely for the purpose of advancing their own personal business, *i.e.*, for the purpose of maximizing receivables in order to protect themselves from liability on their personal guarantees. Moreover, if the factfinder finds sufficient evidence that the Wilsons dominated Seaboard Atlantic, much of the same evidence will bear on the second aspect of the veil-piercing inquiry, that is, whether the Wilsons used such domination to commit a wrong against the plaintiffs, thus causing them injury.

The Court has considered the other issues raised on the motions. Even taking into account

the "heavy burden" on a party seeking to set aside the corporate form, the Court concludes that, viewing the evidence and all reasonable inferences most favorably to plaintiffs, it cannot be said that no reasonable jury could find in plaintiffs' favor.  Nor can it be said that no reasonable jury could find in defendants' favor.  The Court denies the motions and cross motions for summary judgment.

## CONCLUSION

It is therefore

ORDERED in Case No. 5:05-CV-1137, that plaintiff's summary judgment motion (Dkt. No. 38) is denied; and it is further

ORDERED in Case No. 5:05-CV-1137, that defendants' cross motion for summary judgment (Dkt. No. 58) is denied; and it is further

ORDERED in Case No. 5:05-CV-1431, that plaintiff's summary judgment motion (Dkt. No. 28) is denied; and it is further

ORDERED in Case No. 5:05-CV-1431, that defendants' cross motion for summary judgment (Dkt. No. 45) is denied; and it is further

ORDERED that counsel shall electronically file a status report on or before October 7, 2009, with the estimated length of trial and any outstanding issues.   Trial will be scheduled following the filing of the status report.

IT IS SO ORDERED.

September 14, 2009
Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge